## BURDICK v. SEYMOUR.

1. **Principal and Agent:** CONVEYANCE: RATIFICATION. An agent, acting under a power of attorney, conveyed the land of his principal in accordance with instructions received from him, and the principal, with a full knowledge of the conditions under which the conveyance was made, received and retained the consideration therefor and subsequently wrote to the agent that, so far as he knew, he had faithfully performed his trust: *Held*, that the principal ratified the conveyance and was bound thereby.

2. **Damages:** MEASURE OF: FRAUD. S. conveyed certain real estate to B. whose deed was defectively recorded; S. for the purpose of defeating the former conveyance, subsequently conveyed the same property to G. in whom the legal title was afterwards adjudged to be, in an action by G. against B: *Held*, in an action by B. against S., that the measure of damages was the highest value of the land at any time between the purchase by S. and the commencement of his action to recover.

*Appeal from Hancock District Court.*

FRIDAY, SEPTEMBER 25.

PLAINTIFF alleges that on the 27th day of February, 1866, the defendant, through his legally appointed attorney, T. W. Burdick, executed and delivered to plaintiff, a properly executed and acknowledged deed for a certain described forty acres of land, and that T. W. Burdick informed defendant of

the execution and delivery of said deed, and defendant by letter acknowledged the receipt of the consideration and acquiesced in and ratified the conveyance.

That after the recording of the deed, defendant discovered that the recorder had made a mistake in recording the acknowledgment,—which rendered the record insufficient notice to subsequent purchasers,—and that he thereupon, with intent to cheat and defraud plaintiff, executed and delivered to one Julia Gray a deed of the lands before conveyed to plaintiff.

That said Julia Gray commenced an action against plaintiff, in which she claimed to be a *bona fide* purchaser of said lands, and that her title was superior to plaintiff's and that a decree was obtained by default against plaintiff, and his title was made inferior and void as to Julia Gray's. That the value of the land is $400, and that plaintiff expended a large amount of money for taxes on said land, by reason of the wrongful and fraudulent acts of defendant. Plaintiff asks judgment for $500.

Defendant answered, admitting the appointment of T. W. Burdick as attorney, but alleging that the appointment was for the express purpose of securing the location of the county seat of Hancock county, by negotiating with commissioners appointed to locate said county seat. The answer also admits the making of the deed to Julia Gray, but denies that it was done to defraud plaintiff.

Defendant claims of plaintiff $500, because of alleged fraudulent representations respecting the re-location of the county seat of Hancock county, and the alleged fraudulent conveyance to said county of forty acres of land.

The cause was tried by the court, who found against the defendant on his cross-demand, and also found that plaintiff is not entitled to recover, for the reason that no title passed to him under the deed executed by T. W. Burdick, as attorney of the defendant. Plaintiff appeals.

*John T. Clark & Co.*, and *C. P. Brown*, for appellant.

*Bush & Bush*, for appellee.

DAY, J.—The case will be better understood by a chronological statement of the material facts: N. Burdick and T. W. Burdick, of Decorah, under the firm name of N. Burdick & Son, were the land agents of defendant, who resided in Massachusetts, and owned a large quantity of land in Hancock county, Iowa. In 1865, John Popejoy, James Goodwin, and S. B. Hewitt, Jr., were by the District Court of Hancock county appointed commissioners to select the location for the county seat of said county. The minutes of the Board of Supervisors of date November 4, 1865, show that said commissioners reported, selecting for the location of the county seat the SE. ¼ of the SW. ¼ of Section 31. On the same day a resolution was adopted to build two buildings on the place selected, also one appointing James Crow to procure title to the land selected by the commissioners. James Crow wrote Burdick & Son, stating that he and others had been appointed commissioners to negotiate for a title for the county seat of Hancock county; that two points were in view, one on defendant's land, and the other six miles west; that the location was not decided upon, but if defendant would donate forty acres, the location would, in all probability, be made upon defendant's land; that an immediate answer was required. Burdick & Son sent this letter to defendant, and accompanying it wrote him that they had received letters from parties in Hancock county, respecting the re-location of the county seat; that two points were being considered, one on defendant's land, the other six miles west thereof; that it would be desirable for defendant to secure the location on his lands, as it would much increase the value thereof; that whichever point succeeds will have to donate at least the town site; that they were advised forty acres would be required, and that the commissioners have already been appointed to make the location. In this letter they informed defendant that they had written to the parties in Hancock county, requesting that decision be withheld until they could hear from defendant, and that, if an effort was made to secure the county seat, it would be necessary for some one to go out to Hancock county to make arrangements with the com-

*1. PRINCIPAL AND AGENT: conveyance: ratification.*

missioners, to give assurance of the title, and to receive bond or other indemnity that the county seat would be *bona fide* located and buildings erected. They proposed to go to work to get the location on defendant's land, if he would authorize them to do so, and pay them reasonably therefor, or if he would give them forty acres adjoining the forty on which the county seat should be located, that they would pay all expenses and give besides $100 for the land. They further said with no effort on his or their part the county seat would be located elsewhere, and that if they were owners of the land they would make an effort to secure the location. They sent him a diagram of his land, 840 acres in the tract, upon which was marked the proposed location of the county seat, and advised him if he accepted their proposition it would be necessary to send a power of attorney to T. W. Burdick, authorizing him to act in the premises, and to make contracts in relation thereto. Upon receipt of this letter, defendant forwarded a power of attorney to T. W. Burdick, authorizing him to negotiate with the commissioners appointed for and concerning the location of the county seat of Hancock county, upon any land owned by defendant, and in case such location is made, to sell and convey eighty acres of land owned by him, situate either in sec. 6, township 95, or in sec. 31, township 96, range 23. Accompanying this power of attorney, defendant, on the 5th of December, wrote Burdick & Son as follows: " Yours of November 28th, received this day. I am pleased with the prospect of having the county seat for Hancock county located on my lands. Relying on your integrity as gentlemen, not to take advantage of me by making me an unfair offer, I accept your proposition as contained in your letter of November 28, 1865, viz: to donate forty acres to the county for public buildings, and to deed forty adjoining to you in remuneration for expenses if you secure the location as aforesaid; you to pay me $100 for said forty acres; and if you do not succeed, then the forty acres are not to pass to you, and I am not to be chargeable with any expenses or services in the matter. If possible, have the forty acres for the county seat taken so as not to break into more than one lot, and the forty acres for

yourselves either west or north of those for the county use, so as not to divide lots. Of course, I rely wholly upon you to do this and all business relative to my lands in your care, in a fair christian manner. As soon as you advise me of the whole amount of my taxes, I will forward the amount in full; but please scrutinize the tax bill. I retain the diagram of my lands containing the proposed site for county seat, which came in your letter for my use, and I enclose the power of attorney, filled, as I suppose, correctly. * * * * * * * * ”

James Goodwin, one of the commissioners to locate the county seat, testified: " We met at Amsterdam; had two surveyors with us, Mr. Frost and James Crow. When we were at the center of the county we stuck a stake, about 6 miles from present location, and agreed if we could not find a better spot we would locate there. And afterwards came to this present location and stuck a stake, and agreed if we could not get a title to the land, the location of the county seat should be at the other place."

At an adjourned session of the Board of Supervisors on the 25th of December, 1865, the appointment of James Crow was rescinded and J. M. Elder, the clerk of the board, was directed to procure title to the land designated for the county seat. On the 31st of December, 1865, Jacob Ward wrote Burdick & Son as follows: " Yours concerning title to county seat was received by me yesterday, while in settlement with the county, and read to the board. We have erected two buildings on the same site, and are now doing business in them, and if title is given satisfactorily, will be a permanent county seat. * * * * In regard to county seat here, you will hereafter do the business through our worthy clerk of the Board, J. M. Elder, or send deed to me. The county will pay expense of deed."

J. M. Elder testifies as follows: " I made no arrangement with N. Burdick & Son about county seat. The arrangement had been made before with them; I wrote to them about the title two or three times. We did not care to make improvements until title was obtained. I do not recollect of writing them that the location depended on donation of land, but I

did write them that the buildings would not go on until the county had title."

It is claimed that the power of attorney was obtained by fraud and misrepresentation. This finds no satisfactory support in the evidence. It is not proved that at the time of writing the letter of November 28th, Burdick & Son had any information respecting the matter in question, further than that contained in the letter of Crow. It is abundantly proved that this letter of Crow was forwarded to defendant.

The failure to forward the letter of Ward can in no way affect the good faith of Burdick & Son respecting the procuring of the power of attorney, for this letter was not written until the 31st of December, whereas the power of attorney was executed on the 5th of the same month. As the power of attorney was executed on the 5th of December, in response to a letter of the 28th of November, there can scarcely be a doubt that the power of attorney was in the hands of T. W. Burdick long before the receipt of Ward's letter.

Various other objections are urged, as that T. W. Burdick was negligent in the exercise of the authority conferred by the power of attorney; that the power conferred no authority to deed to plaintiff; and that Burdick & Son did nothing to secure the location of the county seat. These objections need not be separately considered. It is quite apparent that the location made by the commissioners was only a conditional one, and that its permanency was to depend upon the procuring of a satisfactory title to the land. It further appears that Burdick & Son were in communication with the county officials for a considerable period, for the first letter of Crow was dated December 20th, 1865, and the deed was not executed until the 27th of February, 1866. The evidence shows that defendant was paid in money for the 40 acres deeded to plaintiff $100, and in services and disbursements to the amount of $20. This was the full value of the land aside from its enhancement through the location of the county seat. Defendant testifies: "I received intimation of the fact that the commissioners had fixed the location of the county seat prior to November 28th, 1865, as early, perhaps, as the latter part of 1867, but more

reliable information thereof came to me as late as 1868 or 1869." It is fully shown that defendant knew the facts concerning the location on the 1st of January, 1870. Yet he retained the amounts paid, and expressed no dissatisfaction at all respecting the conveyance of 80 acres, as authorized in the power of attorney. Upon the contrary, on the 6th of June, 1870, in answer to a communication of T. W. Burdick, he wrote as follows: "Yours of May 30th, is received. You say you understand that I am not fully satisfied with the selection of land, and the fulfillment of a trust given by a power of attorney to convey 40 acres to Hancock county, and 40 acres to Nelson Burdick. I am not aware of having intimated any dissatisfaction with you in this business. As far as I know, you fulfilled the trust reposed in you legally and faithfully. The dissatisfaction lies in another direction."

This letter was written just one month and five days before defendant conveyed the land in question to his daughter, Julia Gray. It is not pretended that in the meantime he gained any additional information respecting the conduct of his agent. In fact, he knew everything that was material before. He knew the county seat had been conditionally located upon his land, prior to Nov. 28th, 1865, and that all that was required to render it permanent was that the title to 40 acres of land should be made to the county. He knew T. W. Burdick had conveyed 40 acres of land to the county; he knew he had conveyed 40 acres of land to Nelson Burdick, and still he says: "I am not aware of having intimated any dissatisfaction with you in this business. As far as I know, you fulfilled the trust reposed in you, legally and faithfully."

The only reasonable construction which can be placed upon this language is, that defendant, in consideration of the $100 paid and the other disbursements made, and their negotiations respecting the perfecting of title, whereby the location of the county seat was made permanent, was satisfied that his agents should have title to 40 acres of the land, and that it made no difference to him whether it was conveyed to Burdick & Son, or to Nelson Burdick. And, indeed, defendant had good reason to be satisfied. For, by the mere conveyance of 80 acres

of land, worth not more than $2.50 per acre, and without further trouble or expense, he secured the permanent location of a county seat upon .part of a tract of 840 acres which he owned in a body, whereby the value of much of it was more than quadrupled immediately. And, in addition to this, he received in money the full value, prior to the location of the county seat, of 40 acres of the land conveyed.

We are satisfied that defendant, with full knowledge of all the material facts, by his subsequent conduct and declaration, ratified the conveyance to plaintiff, and that he is bound thereby.

II. The deed from T. W. Burdick to Nelson Burdick was, in all respects, properly executed, but in recording it the 2. DAMAGES: recorder omitted from the acknowledgment a
measure of;
fraud.　　 material part, so that the record was not constructive notice. On the 11th day of July, 1870, the defendant deeded the land in controversy to Julia Gray, his daughter. In an action brought by said Julia Gray against plaintiff, the title to said land was adjudged to be in Julia Gray, under defendant's deed. The evidence shows that the conveyance was deliberately and purposely made to Julia Gray, in order to defeat the prior conveyance to plaintiff. If defendant had merely made a contract to convey, on which the consideration had been paid, and had then purposely put it out of his power to convey by deeding it to another, the purchaser would recover not merely the price paid and interest, but compensation for the actual loss, embracing the enhanced value of the land at the time the contract should have been executed. See *Foley v. McKeegan*, 4 Iowa, 1 (11).

This case falls under precisely the same principle. Here the vendor, after the conveyance was executed, does an act which at the same time displaces or defeats the prior conveyance, and puts it out of his power to vest the title in the prior purchaser.

This is not properly an action upon the covenant of warranty. A vendor would not be liable upon the covenant of warranty, if the condition which ultimately defeats the title of his grantee, comes into existence after the conveyance is

made, and depends in part·upon the failure to properly record it. If, after this conveyance to plaintiff had been made, a judgment had been recovered against defendant, and, because of the defective recording, the title had passed into the hands of an innocent holder, and the title of plaintiff had been defeated, it is clear the defendant would not be liable upon the covenant of warranty. And, in this case, the failure of plaintiff's title being occasioned purposely by defendant, defendant would be liable for the damages if there were no covenants in the deed. The defendant is liable, not on account of his breach of warranty, but because of his fraud.

We are clear, therefore, that in this case the plaintiff is entitled to recover the highest value of the land at any time between his purchase and the commencement of his suit..

As this value was in no way determined in the court below, final judgment cannot be entered here, and the cause must be remanded.

REVERSED.